# STATE OF CONNECTICUT *v.* RICKY OWEN
## (AC 31021)

Harper, Beach and Schaller, Js.

Argued October 18, 2010—officially released February 1, 2011

*Katherine C. Essington*, special public defender, for the appellant (defendant).

*Linda Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph T. Corradino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Ricky Owen, appeals from the judgment of conviction, rendered following a jury trial, of carrying a pistol without a permit in violation of General Statutes § 29-35 (a) and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c.[1] The defendant claims that the court improperly denied his motion to suppress certain evidence. We affirm the judgment of the trial court.

The record reveals that, prior to trial, the defendant filed a motion to suppress "any and all evidence, whether tangible or intangible, and including statements and identifications . . . seized or obtained illegally, without a warrant or probable cause, or in violation of the Connecticut or United States [c]onstitution[s]." In June, 2008, the court held a hearing on the motion. Thereafter, the court, in a memorandum of

---

[1] The defendant waived his right to a jury trial with regard to a part B information charging him with having committed an offense while released on bond in violation of General Statutes § 53a-40b and being a persistent serious felony offender as defined in General Statutes § 53a-40 (c). The court found against the defendant and enhanced his sentence based on these charges. The court imposed a total effective sentence of seven years incarceration followed by three years of special parole.

decision, denied the motion. In that decision, the court set forth the following findings of fact: "In the early morning hours of March 4, 2008, Sergeant Robert Magnuson was parked in his patrol car on Fifth Street in Bridgeport approximately thirty to fifty feet from its intersection with Stratford Avenue. The front of his patrol car faced Stratford Avenue. Sometime prior to 2:52 a.m., another patrol car, occupied by Officers [Luigi] Tucciarone and [Sam] Leon drove from Stratford Avenue onto Fifth Street and stopped next to Sergeant Magnuson's car. This second patrol car was facing away from Stratford Avenue. At the corner of Stratford Avenue and Fifth Street was a building occupied by Pettway's Store. This building blocked the officers' line of sight up Stratford Avenue.

"At approximately 2:52 a.m., the officers heard three to four gunshots. The [gun]shots were coming from the right of Sergeant Magnuson, somewhere in front of Pettway's Store. Sergeant Magnuson believed that the [gun]shots had come from a location twelve to twenty feet from him.

"After hearing the [gun]shots, Sergeant Magnuson immediately put his car in gear and turned right onto Stratford Avenue. As Sergeant Magnuson proceeded the wrong way up Stratford Avenue, he saw four persons in front of a residence. Three of those persons crossed Stratford Avenue and the fourth walked through a gate, up the stairs and into 1050 Stratford Avenue.

"Officer Tucciarone had followed Sergeant Magnuson onto Stratford Avenue. He also saw the four persons outside 1050 Stratford Avenue. Three of the persons ran across Stratford Avenue to Fourth Street, and the fourth went inside 1050 Stratford Avenue.

"The officers' observations of the four men occurred within seconds of the gunshots. Other than those four, there were no other persons on the street.

"The police pursued the three persons who had crossed Stratford Avenue. Two were stopped by Sergeant Magnuson and Officer Leon. After a foot chase, the third person was stopped by Officer Tucciarone. All three were patted down, and no guns or other weapons were found.

"The police now believed that the shooter was the fourth person who had entered 1050 Stratford Avenue. Sergeant Magnuson directed that the building be surrounded. He then went on to the porch and knocked at the front door. At this point, approximately five minutes had elapsed from the time that the police had seen the fourth man enter the building.

"After repeatedly knocking on the front door, the door was opened by Wanda Smith. She was obviously pregnant. Sergeant Magnuson explained that [gun]shots had been fired in the area and that a person had been seen entering her house. She said that the only persons inside were her and her child. Ms. Smith initially resisted the police request to enter her home. A conversation went on for some minutes with the police emphasizing to Ms. Smith that they needed to check the house for safety purposes. Ultimately, Ms. Smith agreed to let the police officers in [with the] condition that she remain with the police during the search.

"Sergeant Magnuson advised other officers who had arrived on the scene that 'she gave us the okay,' and the police then entered 1050 Stratford Avenue. To the right of the front door in a sitting-living room area, the police found the defendant in his underwear, on a couch. He was detained. Almost simultaneously, an officer discovered a .357 magnum revolver on the floor of one of the bedrooms. The gun was located within seconds of the police entry. Upon inspection, the gun was found to contain four spent shell casings and two

live rounds. After the gun was located, the defendant was arrested."

Initially, the court concluded that the defendant had standing to challenge the warrantless entry into the residence because he "had at least the status of an overnight guest at 1050 Stratford Avenue . . . ." In making this determination, the court found that the defendant resided at the residence with the permission of Smith, who leased the residence. The court found, however, that Smith was unaware of the defendant's presence at the time of the search. Thereafter, the court concluded that the warrantless entry was lawful because Smith had consented to the police search of the residence. As an alternative justification for the search, the court concluded that exigent circumstances justified the warrantless entry into the residence and that, while lawfully present in the residence, the police properly seized the defendant's gun, which was in plain view of the police. In this regard, the court concluded that "[t]he situation presented sufficient exigent circumstances to justify immediate police action in order to protect human life, prevent destruction of evidence and apprehend a suspect who had fled the police." The defendant claims that the court's legal determinations are in error and, thus, that the search violated the prohibition against unreasonable search and seizure guaranteed by the fourth amendment to the United States constitution.[2]

[2] At trial, the defendant couched his motion to suppress in terms of his rights under the state and federal constitutions. Likewise, in his appellate brief, the defendant refers to his rights under the state and federal constitutions. Beyond asserting that states are "free to afford higher levels of protection" against unreasonable search and seizure, the defendant does not independently analyze any aspect of his claim under the state constitution or demonstrate that our state constitution afforded him greater protection than its federal counterpart. Accordingly, we will tailor our analysis to the relevant protection afforded by the federal constitution. See, e.g., *State* v. *Ortiz*, 95 Conn. App. 69, 77 n.2, 895 A.2d 834, cert. denied, 280 Conn. 903, 907 A.2d 94 (2006).

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 222, 3 A.3d 806 (2010).

Although, as set forth previously, the court determined that the search and seizure passed constitutional muster on several diverse grounds, we will confine our analysis to reviewing the court's conclusion that the search and seizure was lawful under the exigent circumstances doctrine.[3] As it relates to this specific rationale,

---

[3] With regard to the court's reliance on the doctrine of consent, the defendant claims that the court's factual finding that Smith had agreed to the police entering and searching her residence was not supported by the evidence. Also, the defendant claims that, insofar as the court concluded that the police entered the residence lawfully under the emergency doctrine, the court's reliance on that doctrine was not supported by the facts of the case. The outcome of this appeal depends only on a finding that the police conduct at issue was constitutional under one of the alternate theories on which the court relied. Because we reach that determination by upholding the court's reliance on the exigent circumstances doctrine, we need not and do not address the claims pertaining to consent or the emergency doctrine.

We note that, apart from arguing that the exigent circumstances doctrine did not apply, the defendant asserts that the state did not argue specifically at the suppression hearing that the search and seizure was legally justified under that doctrine to prevent the destruction of evidence or to pursue and to apprehend the defendant. At the suppression hearing, the court heard evidence that upon their arrival at the Stratford Avenue scene, the police began canvassing the area for a gun. There was evidence that, after the police entered the residence, they discovered the defendant, lying on a couch, near the front door. Seconds later, the police discovered a gun in a bedroom in the residence. The transcript of the suppression hearing reflects that at the suppression hearing the state unambiguously relied on the exigent circumstances exception to the warrant requirement, asserting that it was

the defendant does not appear to challenge the court's findings of fact regarding the facts integral to the search.

"It is indisputable that the home is afforded heightened protection under the fourth amendment. We have long acknowledged that entry by government into a person's home is the chief evil against which the wording of the [f]ourth [a]mendment is directed. . . . The [f]ourth [a]mendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home— a zone that finds its roots in clear and specific constitutional terms: The right of the people to be secure in their . . . houses shall not be violated. [U.S. Const., amend. IV.] That language unequivocally establishes the proposition that [a]t the very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. . . . [I]n terms that apply equally to seizures of property and to seizures of persons, the [f]ourth [a]mendment has drawn a firm line at the entrance to the house." (Citations omitted; internal quotation marks omitted.) *State* v. *Mann*, 271 Conn. 300, 314, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005).

"Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception." (Internal quotation marks omitted.)

proper under the circumstances for the police to enter the residence to locate the defendant and the gun. Thus, the record is clear that the state relied on the exception and the court, likewise, relied on it in denying the motion to suppress.

*State* v. *Johnson*, 286 Conn. 427, 434, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008). Our law recognizes that "there will be occasions when, given probable cause to search, resort to the judicial process will not be required of law enforcement officers. [For example], where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . a warrant will not be required." (Internal quotation marks omitted.) *State* v. *Spencer*, 268 Conn. 575, 585–86, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004).

"The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." (Internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 63–64, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). "It is well established in Connecticut . . . that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. . . . Specifically, [t]he test of exigent circumstances for the making of an arrest for a felony without a warrant . . . is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the arresting officer actually did believe. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on

the basis of facts known at the time of entry." (Citations omitted; internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 293–94, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006).

As this court has observed, "[t]he terms exigent circumstances and emergency doctrine are often used interchangeably when discussing warrantless entries into a home. The term exigent circumstances, however, generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. . . . The emergency exception refers to another type of warrantless entry that evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Klauss*, 19 Conn. App. 296, 300, 562 A.2d 558 (1989).

As a preliminary matter, we conclude that the police had probable cause to enter the residence, 1050 Stratford Avenue, at the time of the entry. "Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . In determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind

not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal." (Internal quotation marks omitted.) *State* v. *Ruscoe*, 119 Conn. App. 834, 844–45, 989 A.2d 667, cert. denied, 296 Conn. 903, 992 A.2d 330 (2010).

Here, the evidence readily would persuade a reasonable person to believe that criminal activity had occurred in that three police officers, at 3 a.m., heard the sound of multiple gunshots close to their location in a residential area. The evidence also would lead a reasonable person to believe that there was a fair probability that contraband or evidence of a crime would be found in 1050 Stratford Avenue. Within moments of hearing the sound of gunshots, the officers arrived at the location of the gunshots. They observed four men fleeing the scene, which was an otherwise deserted city street. A reasonable person would infer that their presence in the area of the gunshots, the early hour and their flight was consistent with their involvement in criminal activity related to the gunshots. The three men who did not flee into the residence were apprehended, searched and found to be unarmed. On these facts, a reasonable person would suspect that the fourth man, who was observed fleeing into the residence, was in possession of evidence of a crime, to wit: the gun used in the incident. Upon knocking at the door of the residence, the police did not learn any facts that would dispel their suspicions, but spoke with Smith, who provided them with facts concerning who was present in the residence. These representations, however, contradicted what the police officers themselves had witnessed moments earlier, thus heightening in the mind

of a reasonable person a suspicion that criminal activity was afoot in the residence.

On the basis of all of these facts known to the police, it was reasonable for the police to suspect that a man who was involved in the shooting had fled into the residence. Because the police had not located a gun in their apprehension of the three men on the street, and a gun necessarily had been used in the criminal activity that they had heard, it was reasonable for the police to suspect that the gun was inside the residence. On these facts, it was proper for the court to find that probable cause existed to search any part of the residence where the defendant or the gun might be present.

Furthermore, it was reasonable for the court to conclude that exigent circumstances existed to support a lawful warrantless entry into the residence. On the basis of firsthand observations, the police had a reason to suspect that four men had participated in criminal activity involving the discharge of multiple gunshots. The police observed these four men fleeing the scene upon their arrival very shortly thereafter. One of the men fleeing the scene, and thus engaging in conduct that was consistent with the evasion of apprehension or arrest by the police, was seen hurriedly entering the residence. Responding to the knocking at the door, Smith did not state that any adult male was present but informed the police that she was in the residence with her child. Upon being presented with information that a shooting had occurred in front of her residence and that a suspect had fled into her residence, Smith initially was reluctant to let the police search the residence.

These facts known to the police at the time of entry gave the police a very strong basis to suspect that a fleeing suspect was hiding from them in the residence. As the court found, approximately five minutes had elapsed from the time that the police observed the man

enter the residence and the time that Magnuson knocked on the door of the residence. Knowing that a suspect who likely was armed had entered the residence and considering the fact that Smith did not provide a plausible explanation for what they had observed, it was reasonable for the police to believe that they were close to making an arrest. Under these facts, it was objectively reasonable for the police to believe that the suspect had entered the residence unlawfully, or at least unbeknownst to Smith, or that Smith was helping the suspect evade the police. In any event, just minutes into their investigation, it was reasonable for the police to believe that the delay necessary to obtain a search warrant would have left them unable or unlikely to effectuate an arrest. Stated otherwise, the police had ample reason to believe that, absent swift action in entering and searching the residence, there was a significant risk of the defendant secreting or destroying evidence linking him to criminal activity or otherwise hampering their ability to apprehend him.[4]

For the foregoing reasons, the court properly concluded that the search was lawful under the exigent circumstances exception. Accordingly, the court properly denied the defendant's motion to suppress evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[4] In contesting the court's determination that exigent circumstances permitted the entry, the defendant, referring to the testimony of the police officers at the scene, suggests that the police had an ample opportunity to secure the residence while obtaining a search warrant. This argument, however, presumes that the only interest of the police was in preventing the suspect from fleeing the residence. As our analysis reflects, the police had a legitimate interest in preventing the defendant from hiding or destroying evidence of criminal activity that would have supported his arrest. Certainly, the police at the scene reasonably could have determined that time was of the essence, such that any appreciable delay in searching the residence would have afforded the defendant an opportunity effectively to conceal or to destroy the gun used in the shooting incident overheard by the police.