## STATE OF CONNECTICUT *v.* VELMON DANNY BRASWELL
### (AC 33053)

Lavine, Alvord and Schaller, Js.

Argued June 3—officially released September 10, 2013

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Michelle Manning*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Velmon Danny Braswell, appeals from the judgment of conviction, rendered after a jury verdict, of kidnapping in the second degree in violation of General Statutes § 53a-94 and interfering with an officer in violation of General Statutes § 53a-167a. On appeal, the defendant claims that the trial

court (1) violated his federal and state constitutional rights to represent himself (a) before trial and (b) during the course of trial,[1] and (2) improperly denied his motion to suppress evidence seized from his (a) home and (b) person. We conclude that the court properly denied the defendant's motion to suppress evidence but erred by denying on improper grounds his motion to represent himself.[2] We reverse the judgment and remand the case for a new trial.

The jury reasonably could have found the following facts. At dusk on October 21, 2009, Emily Person was walking her dog on Stone Street in Stamford. As she passed 58 Stone Street, her dog ran up to the defendant, whom Person knew as Danny King. The defendant petted the dog and then picked it up. He lured Person closer to him by telling her that there was something in the dog's mouth. When Person approached him, the defendant grabbed her wrist, lifted her up, and carried her toward the rear of 58 Stone Street. When Person screamed, the defendant put his hand over her mouth and told her to be quiet. Person bit hard on one of the defendant's fingers. The defendant released Person, who ran to her home at 50 Stone Street. Person told her older sister, Tasha, what had transpired and reported the incident to police.

Officers James McGrath and Henry Wendel responded and interviewed Person at her home. Person described the individual who had grabbed her as a black male with a bald head and no facial hair, who was

---

[1] Because we conclude that the court improperly denied the defendant's request to represent himself made prior to trial, we need not reach his claims concerning his requests to represent himself made during the course of trial.

[2] Although we reverse the judgment of conviction pursuant to the defendant's claim that the court improperly denied his motion to represent himself, we review the defendant's claims regarding his motion to suppress because they are likely to arise on retrial.

wearing a blackish shirt. She also told the police that she knew the man as Danny King. Thereafter, the officers went to 58 Stone Street and knocked on the front door, which was a common entry to the first and second floors. A door in the entryway led to the second floor. Two women answered the door and informed the officers that a person who fit their description of the suspect lived on the second floor. The police knocked on the door to the second floor, but no one answered. The women took the police to the rear of the building, where there was an entrance to the first floor and a back stairway. McGrath noticed the light in the back foyer quickly turn on and off. He also heard someone running up the stairs. He called for police backup. While he was waiting for additional officers to arrive, McGrath and Wendel heard someone running and doors slamming on the second floor. McGrath also heard a loud bang, as if something had been dropped.

After the backup officers arrived, the police entered the second floor apartment. McGrath noticed blood on the knob of the door leading to the second floor apartment, on a light switch, and on a wall. On the second floor, the officers saw a common area consisting of a living room, kitchen, and dining room with bedrooms around the perimeter.[3] The officers also observed a chair that had been moved from the dining table and placed under a hatch to the attic. The officers believed that the defendant was hiding in the attic and instructed him to come out. The defendant did not respond to the officers' commands. To enter the attic, which was dark,

---

[3] The state contends that 58 Stone Street is a two-family house with separate living areas on each floor and that the second floor is a rooming house with a common living area surrounded by private individual bedrooms. The defendant presented no evidence regarding the nature of the living spaces at 58 Stone Street. In submitting a motion to suppress evidence, the defendant contended that he lived on the second floor of 58 Stone Street, but he presented no evidence to that effect. He also presented no evidence as to whether the second floor consisted of one apartment or a common area with individual bedrooms.

the officers secured the assistance of the fire department, which provided a ladder and lights. Five officers entered the attic and observed an arm and leg protruding from under insulation placed between the joists. The defendant ignored the officers' commands to "come out." The officers therefore removed the defendant from between the joists. The defendant made his body tense, which required the officers to use force to handcuff him. The officers noticed a laceration on the defendant's finger that was consistent with Person's account of having bitten the defendant's finger. The officers took the defendant to the front of 58 Stone Street where Person, after asking the defendant to speak, identified him as the man who had attacked her.

The defendant was taken to the police station to be "processed." In the meantime, Officer Edward Rondano collected evidence from the second floor of 58 Stone Street and from the blood on the exterior of the door leading to the second floor. Rondano also collected evidence from the defendant's bloodied finger. The blood samples were analyzed for the presence of Person's DNA.[4]

At trial, Patricia Johannes, a forensic science examiner, testified about the results of the DNA testing. The blood evidence taken from the door to the second floor of 58 Stone Street and the defendant's finger contained Person's DNA. After the jury found the defendant guilty, the court imposed an effective sentence of twelve years incarceration followed by eight years of special parole. Additional facts will be provided as needed.

I

The defendant claims that the court violated his state and federal constitutional rights to self-representation[5]

[4] Person provided the police with a buccal sample for DNA analysis. A buccal sample is taken by brushing a sterile swab against the inside of a person's cheek to obtain cells to be used for DNA analysis.

[5] Our Supreme Court has treated the state and federal constitutional provisions regarding the right to self-representation as providing the same level

by denying his motion to dismiss his appointed counsel and to represent himself.[6] The defendant contends that his requests to represent himself were timely, clear and unequivocal; the state does not disagree. We conclude that the court denied the defendant's motion to represent himself on improper grounds. When ruling on a motion for self-representation, the court must determine whether the criminal defendant's waiver of the constitutional right to counsel is knowingly and intelligently made. See Practice Book § 44-3.[7]

We begin with a recitation of the principles regarding a criminal defendant's right to represent himself. "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense. The sixth amendment right to counsel is made applicable to state prosecutions through the due process clause of the fourteenth amendment. . . . [T]he United States Supreme Court [has] concluded that the sixth amendment embodies a right to self-representation and that a defendant in a state criminal trial has

of protection. See *State* v. *Jones*, 281 Conn. 613, 647 n.26, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007).

[6] As a matter of policy, the judicial branch utilizes the term self-represented party in lieu of the Latin term pro se. Throughout the proceedings in the trial court, however, the defendant, counsel, and the court used the term pro se. In this opinion, we utilize the term used in the trial court.

[7] Practice Book § 44-3 provides that "[a] defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself . . . at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Flanagan*, 293 Conn. 406, 417, 978 A.2d 64 (2009).

"[T]he [c]onstitution does not force a lawyer upon a defendant. He may waive his [c]onstitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open." *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942). Our Supreme Court has recognized "the inviolability of the right of self-representation." *State* v. *Brown*, 256 Conn. 291, 302, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001). "To force a lawyer on a defendant can only lead him to believe that the law contrives against him. . . . The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Flanagan*, supra, 293 Conn. 418.

"Although a defendant need not have the skill and expertise of an attorney to competently and intelligently choose to proceed pro se, a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver." (Internal quotation marks omitted.) Id., 419. "[O]nce

there has been an unequivocal request for self-representation, a court must undertake an inquiry [pursuant to Practice Book § 44-3], on the record, to inform the defendant of the risks of self-representation and to permit him to make a knowing and intelligent waiver of his right to counsel." (Internal quotation marks omitted.) *State* v. *Jordan*, 305 Conn. 1, 14, 44 A.3d 794 (2012). "[W]hether the defendant's request was clear and unequivocal presents a mixed question of law and fact, over which . . . our review is plenary." *State* v. *Flanagan*, supra, 293 Conn. 420.

Practice Book § 44-3 "was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § [44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. . . . Because the § [44-3] inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provision of § [44-3] cannot be construed to require anything more than is constitutionally mandated." (Internal quotation marks omitted.) Id., 419.

"[A]ssuming . . . that a defendant's request to [represent himself] is informed, voluntary and unequivocal, [his right] to act as his own lawyer is *unqualified* if invoked prior to the start of the trial." (Emphasis in original; internal quotation marks omitted.) Id., 431. "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to harmless error analysis. The right is either respected or denied; its deprivation cannot be harmless." (Internal quotation marks omitted.) Id., 434.

The following facts are relevant to our resolution of the defendant's self-representation claim. Attorney Benjamin Aponte of the public defender's office had been appointed to represent the defendant. Pursuant to the trial schedule, jury selection was to begin on April 28, 2010, and the presentation of evidence was to begin on May 26, 2010. On March 1, 2010, the defendant filed pro se a motion for a speedy trial. On April 6, 2010, the defendant filed pro se a handwritten motion entitled "Motion for [Removal] Attorney and Motion to go [p]ro-[s]e in Case."[8] On April 23, 2010, the defendant filed another motion for a speedy trial. Aponte and the prosecutor appeared in court on April 28, 2010. When the case was called, the court inquired whether the defendant was present. The following colloquy occurred:

"[Defense Counsel]: He is, Your Honor. Benjamin Aponte on behalf of [the defendant]. . . . [The defendant] is currently incarcerated. He's informed me that he does not wish to come out and have me represent him. He's indicated to me that he . . . would prefer to go pro se, with regard to this matter. In addition thereto, he's informed me that if the court . . . were to force

[8] The defendant's motion for removal states: "Now come's the Defendant Velmon Braswell pro-se asking the court's of the state of Connecticut to remove . . . Aptont[e] who was appointed to the defendant case on 10-22-09 by the Judge of this court.

"Reason's for Removal

"[1.] From 10-22-09 the defendant has requested all the discovery in the case above and . . . Apont[e] to this point has 'not' given legal assistance to defendant . . . or to legal material's in the case above for his defend's under the law's of the U.S. constitution and under the State of Connecticut constitution to access to the court's and at this point . . . Apont[e] in the public defender office's has 'not' filed any motion's requested or asr's by the defendant above in violation of the above defendant's civil right's with 'no' access to the court's.

"[2.] The defendant . . . ask this court to go pro-se on his case do to the fact's above and the inaction of the attorney and the office of the public defender's . . . ."

In his motion to remove, the defendant claimed that black defendants and poor people are treated with racial bias.

him to come out and proceed forward with this trial, that he would be disruptive throughout the process.[9]

"The Court: Well, let's bring him out. I'm not going to conduct a trial in his absence. I'd be happy to hear anything he'd like to say. And then, I'll rule accordingly. All right. Good morning, Mr. Braswell.

"The Defendant: Good morning, Judge.

"The Court: All right. Now, Mr. Braswell, just before you came out, Attorney Aponte told me that you did not wish to go forward this morning. You either did not wish to go forward, or you did not wish to use Attorney Aponte as your counsel.

"The Defendant: There's a conflict of interest between me and Attorney Aponte. . . . I don't feel . . . he has enough time to spend with me on my case."

The defendant complained that he had not yet received certain discovery that he had requested. The court explained that, although a jury was to be selected that day, the presentation of evidence would not begin until May 26, 2010, and that it would address various motions filed by the defense that day. The court also assured the defendant that it would ensure that Aponte provided him with the discovery materials he wanted.

Nonetheless, the defendant stated that he still had a problem with Aponte, whom he claimed was over-worked. He stated: "I believe they're stalling. . . . I want to be able to prepare myself for this case. And I also put the motion in to go pro se, if I have to. I do not trust the public defender's office, at this point. Because I feel they've been pulling punches. . . . [Aponte has] tried. But I don't see him trying hard

---

[9] Later in the proceeding, Aponte stated that the defendant "filed this motion for a speedy trial, not me. I was never consulted on this speedy trial motion. I never received a copy of it. I was not informed until late yesterday afternoon that I was going to be here today, picking a jury."

enough in my particular case. . . . I don't trust him, at this point. . . . It just seems he goes to the other side. So, he's not being impartial to me. . . . There is a prejudice that I went through in the last six months, that's put me in hardship. And right now, I don't trust it. And I would leave the courtroom, because I would hate to make a scene in here, in front of the jury. And I'm going to respect you. . . . And I'm going to ask to remove myself from the courtroom and protest that I don't want this attorney on my case. And, it's simple."

The court stated: "[W]hat I hear you telling me, it's not a problem with this attorney . . . . He's a good attorney. Your concern is really that he doesn't have the time . . . ." The court asked the defendant if he had substitute counsel ready to come in. The defendant replied that he did not because he had no discovery, particularly the police report, to prepare the case.

In response to the court's inquiry, Aponte represented that he had not provided the defendant with a redacted copy of the police report, but that he would do so that day. Aponte also represented that he had reviewed the police report with the defendant when he visited with him in jail and in the courthouse; that he took notes of the things with which the defendant disagreed and investigated the issues; and that he had informed the defendant of the results of his investigations. Although the defendant did not have physical copies of reports and investigations, he had been informed of their contents. Aponte stated that the state had complied with its discovery obligations. It has an open file policy, and the prosecutor had met with Aponte and given him copies of police reports.

The court stated to the defendant that "the real world in which we operate . . . [a] lot of the preparation for trial . . . occurs the closer the trial gets." On the basis of what it had heard from Aponte and the prosecutor,

the court concluded that the defendant's receipt of information had not been unfairly delayed and that there was no prejudice to him. The court therefore denied the defendant's request to continue the trial.

The defendant acknowledged that Aponte had shown him discovery materials, but he continued to complain that he did not have copies of discovery. The defendant stated that he had filed numerous motions for a speedy trial, but complained that he did not know that he was to appear in court that morning because Aponte never told him.[10]

"The Court: Well, Mr. Braswell, really what I'm hearing from you is just a kind of a generalized complaint about the amount of time that Attorney Aponte has spent with you. And what you perceive as his level of activity. I don't have any specific information that would enable me to make a finding, or even to think that there's a reasonable basis for that. So, I'm going to deny your request to proceed pro se. I'm happy to talk to you further about that.

"What I need to know, if you want to proceed pro se, your educational background; what experience you have in handling legal matters; whether you're prepared on the issues you anticipate coming up in this case.

---

[10] Aponte was given permission to address the court and stated: "[The defendant] . . . admits that I'd gone to see him [in jail]. Granted, this is the first time that it's been without a glass between us, but I've gone to visit him. I've gone and explained the allegations against him. I've informed him of what the state needs to prove, and what the maximum exposure is. . . . I've informed him of all that. He still wants to have a trial. He's filed this motion for a speedy trial, not me. I was never consulted on this speedy trial motion. I never received a copy of it. I was not informed until late afternoon yesterday that I was going to be here today, picking a jury. . . .

"So, it seems to me that [the defendant] is using this motion for a speedy trial, as a vehicle to air out whatever grievances he may have against me as well as whatever else he might think of the court system in itself. I don't know if he actually wants to go, but if he wants to go forward today, I'm prepared to go forward today."

. . . [T]hese are serious charges, and ones where the assistance of competent and trained counsel really is all but essential. And I strongly encourage you to use counsel. And I haven't heard anything, as to why this attorney would be inappropriate. . . .

"The Defendant: My background is that I got fourteen years of school, two years of law enforcement. And I wrote the basic motions I can file. I can do things like that. I also know about trials—a little bit about trials. I've been on one before. Other than that, I don't trust Mr. Aponte to this point. And again, I will not sit in this courtroom. I will not—I will ask to leave. If I'm not— to get my motions in, or my discovery."

The court asked the defendant to elaborate on his two years in law enforcement. The defendant stated that he worked as a campus police officer at Western Connecticut State University, had power to arrest, and has an understanding of the law. He stated that in that capacity he testified in three trials. The defendant represented himself against charges brought against him by the commonwealth of Pennsylvania and was acquitted. The court asked the defendant to explain those charges, but the defendant refused to do so. The defendant then requested a one month postponement to prepare for trial after he received copies of all discovery.

The court informed the defendant that it was going to deny his motion to remove his attorney and proceed pro se, but that it would discuss the status of discovery with the state and create a strict time line to get discovery to Aponte. The court again informed the defendant that evidence was not going to begin until May 26, 2010. If the defendant had substitute counsel who was ready to proceed between jury selection and May 26, 2010, or if there were more discovery issues, the court would reconsider the motion to remove his attorney and proceed pro se. The court also informed the defendant

that it was important for him to be present during jury selection to consult with Aponte.

The defendant stated that he understood the importance of being present for jury selection, but that he wanted the marshals to take him out of the courtroom at that time. The court stated that the marshals look to the court for guidance, that jury selection was going to start, and that if the defendant became disruptive, he would be removed from court. The defendant stated that he wanted to leave then and that it was his right not to stay in the courtroom. The defendant spoke over the court, and was told by the court not to interrupt. The defendant sought to leave the courtroom, and the court ordered the marshal to hold him. The court wanted to ensure that the defendant understood the decision he was making. The defendant stated: "I made a decision, sir, and I understand. I've done this before. It's not the first time, sir."

The court ordered the marshal to seat the defendant, who continued to protest and asked to remove himself from the courtroom. Eventually, the defendant stated: "I give up that right. Do the trial without me. That's what you want to hear? Now, I'm leaving. All right? Do the trial without me, please. In all due respect, Judge. You've been fair to me. I'm being fair to you. Let me walk out of the courtroom because I will get—there'll be a mistrial. Every time I get here, you will have to gag me. Simple as that."

After the court again asked the defendant if he knew that he had the right to be present, the defendant stated: "I understand the fact that this is a racist court. And I understand the fact that I'm not gonna sit here and take this. You know, I just got manhandled for no reason at all." The court then ordered the marshals to remove the defendant to an observation room where he could

view the proceedings. The defendant stated that he did not want to see the court proceedings.

After the defendant was removed, the court stated for the record that it had attempted to review the defendant's rights but had not been able to review all of them and that the defendant had been removed from the courtroom. The court ordered the marshal to make sure that the window in the observation room was open so that the defendant could observe jury selection. The court also instructed the marshals that if the defendant wanted to return to the courtroom to inform the court immediately.

In response to the court's inquiry as to how he would like to proceed, Aponte stated that he found himself in a difficult position in that the defendant did not trust him and that the defendant did not want to be part of the proceedings. Aponte also expressed concerned that the defendant may create some sort of commotion in the observation room that would prejudice him to the venire panel. Thereafter, the court took a brief recess.

When court reconvened, the court stated that the defendant had reported feeling pain in his arm and requested medical attention. In an exercise of caution, emergency medical personnel were called, and the defendant was taken to an emergency room for examination. The court canceled jury selection for the remainder of the day. The court and counsel discussed the difficult issue of resuming jury selection in light of the defendant's speedy trial motion and his request for a continuance to review discovery. The court ordered that jury selection would continue in one week, with the expectation that the defendant would be feeling better at that time.

The court concluded the session, stating: "I hope [the defendant] is feeling better. And hopefully, he's going to be more receptive to participating in this. If he wishes

to request a continuance, I'm going to require that he withdraw his speedy trial motion. And then I'd be happy to consider a reasonable delay for him to review discovery and get comfortable, either with continued representation, or make arrangements for new representation. But I can't have him going both ways. He can't demand a speedy trial, and then obstruct the trial. So, we're going to have to get a decision on that front."

We agree with the defendant that he clearly and unequivocally asserted his right to represent himself when he filed a motion entitled "Motion for [Removal] Attorney and Motion to go [p]ro-[s]e in Case" and, on April 28, 2010, addressed the court and stated that he wanted to represent himself. When a defendant seeks to represent himself, the court is required to canvass the defendant pursuant to Practice Book § 44-3 to determine whether the defendant's waiver of the constitutional right to counsel is knowing and intelligent. See *State* v. *Flanagan*, supra, 293 Conn. 418.

Our review of the transcript of April 28, 2010, reveals that the defendant filed a motion for a speedy trial without having informed Aponte, who only learned that he was to begin trial in this case the previous day. It is true that, from the beginning, the defendant's behavior demonstrated a lack of decorum; he was not present in the courtroom when the court called his case. He directed Aponte to inform the court that he did not want to come into court and have Aponte represent him, and that he preferred to represent himself. Moreover, Aponte stated: "In addition thereto [the defendant] informed me that if the court . . . were to force him to come out and proceed forward with this trial that he would be disruptive throughout the process." The defendant therefore was threatening the court that, if he did not get his own way, he would be disruptive. The court ordered that the defendant be brought into

the courtroom so that it could determine whether he did not want to go forward or that he did not want Aponte to represent him.

The defendant claimed a conflict of interest with Aponte and that he had not received the discovery materials he had requested. The court noted the defendant's motion for a speedy trial and the state's attempt to accommodate that request.[11] The court informed the defendant of its efforts to resolve his presumed conflict regarding discovery. Nonetheless, the defendant stated that he did not trust Aponte. The court opined that, given the facts regarding discovery as presented, Aponte had reasonable access to the defendant.

We agree with the defendant that whether Aponte's representation of him was adequate was not relevant to whether he should be permitted to represent himself. A defendant's request to represent himself may not be denied on the basis of the trial court's perception of the adequacy of trial counsel's representation. See *State* v. *Flanagan*, supra, 293 Conn. 424–25, citing *United States ex rel. Maldonado* v. *Denno*, 348 F.2d 12 (2d Cir. 1965), cert. denied sub nom. *DiBlasi* v. *McMann*, 384 U.S. 1007, 86 S. Ct. 1950, 16 L. Ed. 2d 1020 (1966). "[O]nce there has been an unequivocal request for self-representation, a court must undertake an inquiry [pursuant to Practice Book § 44-3], on the record, to inform the defendant of the risks of self-representation and to permit him to make a knowing and intelligent waiver of his right to counsel." (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 305 Conn. 14.

In this case, the timing of the court's ruling on the defendant's motion to "go [p]ro-[s]e" was unclear. Although the court stated that it was denying the defendant's motion to "go [p]ro-[s]e" after discussing the

---

[11] We note that the incident underlying the defendant's conviction occurred in October, 2009, and the state was ready to proceed to trial in March, 2010.

defendant's dissatisfaction with Aponte, it also stated that it was open to reconsidering the matter at a later time. The court then attempted to canvass the defendant pursuant to Practice Book § 44-3. The court was not able to complete its canvass because the defendant refused to answer certain questions about a criminal action against him in Pennsylvania.

On appeal, the state contends that, although the court technically did not comply with the canvass required by Practice Book § 44-3, the defendant was not entitled to a full and complete canvass because he was uncooperative and disruptive. See *State* v. *Jones*, 281 Conn. 613, 647–50, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007). We do not dispute that a defendant who is uncooperative and disruptive is not entitled to represent himself; id., 648; however, the court here denied the defendant's request to represent himself on the basis of his relationship with counsel and the state of discovery. Those two factors were not relevant to the defendant's motion to represent himself because trial had not yet commenced. See *State* v. *Flanagan*, 293 Conn. 431. When the defendant filed his motion to "go [p]ro-[s]e" and indicated to the court that he wanted to pursue that motion, the court was required to canvass him pursuant to Practice Book § 44-3, regardless of the state of affairs between the defendant and Aponte.

We have reviewed the entire transcript of the pretrial proceedings, jury selection, and trial. We agree with the state that, subsequent to April 28, 2010, the defendant was at times disruptive, sought continuances in the face of his speedy trial motions, failed to cooperate with the marshals and even threatened to fight with them.[12] Our Supreme Court has recognized "that a trial

[12] On July 27, 2010, during the hearing on the defendant's motion to suppress, the court stated, after Aponte again conveyed the absent defendant's request to "go [p]ro-[s]e": I have a defendant who, when he does come in, he's either told me he wishes to leave or he wishes to go to the hospital or

court properly may deny a request for self-representation when it is merely a tactic for delay . . . or an impulsive response . . . or is made in passing anger or frustration . . . or to frustrate the orderly administration of justice . . . or is an insincere ploy to disrupt the proceedings . . . ." (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 305 Conn. 22. The defendant's post-April 28, 2010 behavior would, unquestionably, have provided a basis for the court to deny the defendant the right to represent himself; see *State* v. *Jones*, supra, 281 Conn. 648 (well established that defendant through his disruptive behavior may forfeit right to self-representation); but that was not the situation on the day the court first was presented with the defendant's clear and unequivocal motion to represent himself. When presented with the defendant's request to represent himself before trial, the court was required to canvass him pursuant to Practice Book § 44-3, and to exercise its discretionary ruling on the basis of the defendant's response to the canvass. Instead, the court denied the defendant's clear and unequivocal request to represent himself on the basis of the court's assessment of counsel's performance and the state of discovery. This was improper.

We are well aware of the trial management challenges a court faces when confronted with difficult situations such as the one presented in this case. We also understand that trial judges sometimes, with the best of intentions, seek to protect defendants from the adverse consequences of what judges perceive to be an ill-advised desire to represent themselves. The right of self-representation, however, is of constitutional magnitude, and competent defendants who are properly canvassed must be left free to exercise it. When the

he wishes to fight with the marshals, everything but stay and participate in a meaningful manner. How are we going to have this trial or complete the motions without counsel of record?"

defendant clearly and unequivocally requested to "go [p]ro-[s]e," the court was required to canvass him pursuant to Practice Book § 44-3 to determine whether he was knowingly and intelligently waiving his right to counsel. We conclude that the court improperly denied the defendant's motion to "go [p]ro-[s]e" for reasons not relevant to that rule. The court's improper ruling is not subject to harmless error analysis; see *State* v. *Jordan*, supra, 305 Conn. 23 (violation of sixth amendment right to self-representation is structural error); and we therefore are required to reverse the judgment of conviction.

II

The defendant claims that the court improperly denied his motion to suppress evidence that the police obtained from (1) his home and (2) his person without a warrant or his consent. We do not agree.

On February 1, 2010, Aponte filed a motion to suppress from evidence the fruits of searches and/or seizures of the defendant's person, house, papers, and effects, including physical evidence, tests, observations by law enforcement officers, and testimony. The defendant based his claim on his constitutional rights to privacy. The defendant claimed to be a tenant of the apartment at 58 Stone Street and that the police had not obtained a search warrant before they entered his home.

The defendant argued that there were no exigent circumstances to prevent the police from obtaining a warrant before swabbing the defendant's injured finger for DNA evidence. The defendant sought to suppress any statements he made when the police entered his home, any physical evidence seized, and observations the police made while in his home. The court heard the arguments of counsel on July 27, 2010, but neither party

presented any evidence.[13] The matter was continued until August 9, 2010.

On August 9, 2010, the state called Officer Rondano to testify. On the evening in question, Rondano had been dispatched to 58 Stone Street where he observed blood on the door outside the second floor apartment. When Rondano returned to the police station, Sergeant James Van Allen directed him to collect a sample, which could contain Person's DNA, from the defendant's bloodied left index finger. Rondano described the manner in which he obtained the sample and also stated that any delay in obtaining the sample increased the possibility that DNA evidence, if any, could have been destroyed, intentionally or inadvertently, given that it was on the defendant's finger.

The state also called Van Allen, who testified that he had observed the defendant, who was covered with dust and insulation when he was brought to the police station. He also saw a bloody wound on the defendant's left index finger. Van Allen believed that the defendant's bloodied finger might contain evidence of the victim's DNA, if she had bitten him there. Van Allen also testified as to the procedure for obtaining a search warrant and the length of time it takes to secure a search warrant, particularly at night. On the basis of his training and experience, Van Allen testified that he believed that the evidence needed to be preserved and that every hour that passed created a risk that the evidence could be destroyed.

The defendant presented no evidence, but argued that the DNA evidence taken from his finger should be suppressed because he did not consent to have the evidence collected from his finger, and the police had

[13] The arguments of counsel are not evidence. See State v. Begley, 122 Conn. App. 546, 552 n.10, 2 A.3d 1 (2010).

not obtained a warrant to take the sample. The defendant also wanted the court to suppress any statements he made to the police. The defendant, however, failed to present any evidence as to whether he was in police custody at the time he uttered his statements.

The state argued, on the basis of the evidence presented, that the police had an objective, reasonable belief that exigent circumstances existed with respect to the potential evidence on the defendant's injured finger. The officers who testified stated that it would have been inappropriate for the police to restrain the defendant until a warrant was obtained, thus delaying medical treatment for the defendant's injury. Moreover, due to the nature of the defendant's injury, a bloodied cut on his finger, any evidence easily could have been lost or destroyed inadvertently or intentionally. The court denied the defendant's motion to suppress.

"Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks omitted.) *State* v. *Owen*, 126 Conn. App. 358, 364, 10 A.3d 1100, cert. denied, 300 Conn. 921, 14 A.3d 1008 (2011). "Our law recognizes that there will be occasions when, given probable cause to search, resort to the judicial process will not be required of law enforcement officers. [For example], where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . a warrant will not be required. . . .

"The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be

unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. . . . [T]he test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. . . . Specifically, [t]he test of exigent circumstances for the making of an arrest for a felony without a warrant . . . is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the arresting officer actually did believe. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry." (Citations omitted; internal quotation marks omitted.) Id., 365–66.

"The scope of review when analyzing the application of the exigent circumstances doctrine is well established." *State* v. *Kendrick*, 132 Conn. App. 473, 481, 31 A.3d 1189 (2011), cert. granted on other grounds, 303 Conn. 925, 35 A.3d 1076 (2012). "The trial court's finding of facts will stand unless they are clearly erroneous. Its legal conclusion regarding the applicability of the doctrine, however, is subject to de novo review. . . . The burden is on the state to establish the facts that justify the application of the exigent circumstances doctrine." (Citation omitted.) *State* v. *Aviles*, 277 Conn. 281, 292, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006).

A

The defendant claims that the court improperly denied his motion to suppress evidence that was

obtained without a warrant and without his consent when the police unlawfully entered his home and made an unconstitutional arrest. The state claims that the defendant abandoned this claim. We need not determine whether the defendant abandoned this claim at trial because we conclude that he failed to demonstrate that he had a reasonable expectation of privacy with regard to the second floor of 58 Stone Street. See footnote 3 of this opinion. The court therefore properly denied the defendant's motion to suppress with regard to evidence found at 58 Stone Street and the defendant's statements.

The defendant's claim concerns the following facts. On February 1, 2010, the defendant filed a general motion to suppress evidence. The defendant sought "to suppress from evidence the fruits of searches and/or seizures of the defendant's person, house, papers . . . ." Following the hearing on the defendant's motion to suppress, the court denied the motion as to the DNA evidence obtained by swabbing the defendant's injured left index finger. Thereafter, the defendant filed a motion for articulation with regard to evidence obtained from "his home."

In its articulation, the court stated in part: "Throughout the [August 9, 2010] hearing, the great majority of the evidence and argument was directed toward a DNA sample, taken from the defendant's finger wound . . . . At various points during the hearing, the court tried to ascertain exactly what other items of evidence the defendant was actually trying to suppress. Though at the start of the hearing, [the] defendant indicated [that he] wished to suppress 'any and all evidence that the Stamford Police Department received when it entered into the home of [the defendant]' . . . no specific item of evidence, other than the DNA sample, was ever identified. . . . The court again inquired if [the motion to suppress] pertained to the DNA, and the defendant

stated [that] it went to the DNA sample 'as well as any statements made by [the defendant] . . . at the time he was arrested in the attic.' . . . [The] [d]efendant did not identify any other item of evidence which he wished to suppress. [The] [d]efendant's failure to identify any items of evidence which he wished the court to suppress, other than the DNA and statements made by [the] defendant, led the court to limit its ruling to only those items which were addressed." (Citations omitted; footnotes omitted.)

The court also stated that "there had been little testimony offered by either side during the suppression hearing as to any circumstances which occurred other than at the Stamford Police Department. Defense counsel's argument was made in terms of a search of [the] defendant's 'home,' but no such home was ever described in the hearing. There were references to an apartment and then, to just a room. [The] [d]efendant offered no testimony as to his expectation of privacy in any area which might have been searched. 'The application of the fourth amendment prohibition against unreasonable searches and seizures requires the defendant to establish that he had a legitimate expectation of privacy in the invaded area.' *State* v. *Mooney*, 218 Conn. 85, 94, 588 A.2d 145 [cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270] (1991). The testimony given by the police officers also did not establish such expectation. Here, the testimony introduced by officers was that one officer had processed the 'crime scene.' . . . Another officer said, 'We weren't processing his room, we were processing the outside.' . . . There was testimony about a blood smear seen on the doorknob on the outside of the defendant's apartment. . . . It was never established whether these areas were ones in which [the] defendant claimed an expectation of privacy or that evidence had been taken from other than public areas. In light of such testimony, it did not

appear that any evidence had been secured in an area where the defendant had a legitimate expectation of privacy." (Citations omitted.)

On the basis of our review of the transcript, we conclude that the court properly denied the defendant's motion to suppress. The defendant failed to establish that he had a reasonable expectation of privacy in the doorknob on the outside of the second floor "apartment" at 58 Stone Street. Evidence of the defendant's relationship with the location is necessary to establish a reasonable expectation of privacy. See *State* v. *Boyd*, 57 Conn. App. 176, 185, 749 A.2d 637 (relationship with location personal; relationship more than sporadic, irregular or inconsequential; location and items within maintained in private manner at time of search), cert. denied, 253 Conn. 912, 754 A.2d 162 (2000). Our review of the record discloses no evidence that the defendant had a reasonable expectation of privacy with respect to the second floor of 58 Stone Street. See id. We also see no evidence that the defendant had an expectation of privacy in the attic where the police found and arrested him. See id. The court therefore properly denied the defendant's motion to suppress evidence.

B

The defendant's second suppression claim is that the court improperly denied his motion to suppress DNA evidence that was obtained without a warrant and without his consent resulting in a violation of his constitutional rights. We disagree.

At the conclusion of the suppression hearing, the court issued its ruling from the bench. The court stated in part with regard to evidence collected from the defendant's finger: "I find that exigent circumstances did exist at the time at which the DNA evidence was secured, necessitating immediate retrieval of the DNA sample. I note there was a significant risk here of

destruction of the evidence, either intentionally by the defendant or unintentionally through natural perspiration, blood flow at the site of the wound, or inadvertent rubbing or processing of the defendant. Even in the process of securing fingerprints, that portion of the finger could have been impacted.

"So, the location of the wound here, at the end of the left index finger, made it impossible to preserve possible evidence at the site. I note that there was a noninvasive and painless procedure used to secure the evidence. And this was evidence that could exonerate as well as incriminate the defendant. Even now, I don't know what the result of that DNA sample was.

"Also, evidence was needed to be secured promptly to allow the defendant to receive medical treatment for the wound, and also to resume the natural use of bathroom facilities, other personal needs. Given the time of day, the availability of a warrant, it would not have taken more than a few seconds of further delay. At any time, this evidence might have been lost. So, in light of all the circumstances, I'm going to make a finding that exigent circumstances did exist and that they justified the absence of a warrant.

"With regard to any statements, there hasn't been any evidence to demonstrate that the defendant was in custody at the time of any statements. There hadn't really been any evidence on that or that the defendant was subject to police interrogation. That's the burden of the defendant, and the defendant can renew that motion as evidence comes in of particular statements. But as of now, there's no basis to grant that motion. The motion is denied."

On the basis of our review of the evidence presented at the suppression hearing, we agree with the court that exigent circumstances existed with regard to the collection of DNA evidence, which was at risk of being

lost, either intentionally or inadvertently. The state met its burden of establishing exigent circumstances by an objective reasonable grounds standard. See *State* v. *Aviles,* supra, 277 Conn. 292.

With regard to the defendant's statements which he sought to suppress, our review of the record reveals facts consistent with the court's findings that the defendant never established that he was in police custody or that he was being interrogated by the police at the time he made statements in their presence. The court therefore properly denied the defendant's motion to suppress evidence.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.