******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RICARDO CORREA
## (AC 39899)

Alvord, Prescott and Beach, Js.

*Syllabus*

Convicted, following a conditional plea of nolo contendere, of the crimes of conspiracy to possess a controlled substance with intent to sell, conspiracy to possess a controlled substance with intent to sell by a person who is not drug-dependent, and conspiracy to operate a drug factory, the defendant appealed to this court, claiming that the trial court improperly denied his motion to suppress certain evidence that was seized from his motel room after the police conducted a warrantless canine sniff of the front door of the motel room, which was open to the public and located in an open, shared walkway. The police were surveilling the building for illegal activity and observed what appeared to be a drug transaction out of the defendant's motel room. Thereafter, the police conducted a canine examination of the walkway of the motel. After the canine alerted the handler that it had detected contraband at the bottom of the door to the defendant's motel room, the police applied for a warrant to search the motel room. Prior to obtaining the warrant, the police detained the defendant and used his room key to open the door to look inside his room for occupants who might destroy evidence. A police officer, in conducting the visual sweep of the room without entering it, observed evidence of drug activity. In his motion to suppress, the defendant argued that the police officer's visual sweep of the room was per se unreasonable as it was performed without a valid search warrant and that the search did not fall within any recognized exceptions to the warrant requirement. On appeal, the defendant claimed, for the first time, that the warrantless dog sniff outside the door to his motel room violated his rights under article first, § 7, of the state constitution. *Held*:

1. The defendant could not prevail on his unpreserved claim that the dog sniff constituted a violation of his state constitutional rights: the defendant's claim that the police were required to obtain a warrant before conducting a dog sniff search of the pathway outside of his motel room was unavailing, as the defendant, under the facts of this case, did not show a reasonable expectation of privacy on the outside of the door to his motel room and cited no authority to support his assertion that a canine sniff outside the door of a motel room, conducted from an open, shared walkway, which was located outside of the structure and visible to and accessible by any member of the public, constituted a search within the meaning of article first, § 7, of the state constitution; moreover, the defendant also was unable to prevail under the plain error doctrine, as he could not demonstrate that an obvious error existed that affected the fairness and integrity of and public confidence in the judicial proceedings.

2. The defendant's claim that the conduct of the police in opening the door to his motel room and conducting a visual sweep of the room without a warrant was unlawful under the federal and state constitutions was unavailing, trial court having properly concluded that the search was lawful under the exigent circumstances exception to the warrant requirement: although the defendant claimed that the testifying officers could not identify any definite and specific reason for believing that someone was in the room who might destroy evidence and, thus, that the officers did not hold a reasonable belief that immediate action was necessary, probable cause existed to search the motel room, as there was ample evidence that would persuade a reasonable person to believe that criminal activity had occurred and to conclude that there was a fair probability that contraband or evidence of a crime would be found in the motel room; moreover, under the totality of the circumstances, a reasonable, well trained police officer reasonably would have believed that immediate entry into the motel room was necessary to prevent the destruction of evidence, as the police had reason to suspect, on the basis of firsthand observations, that criminal activity was occurring in the motel room,

those suspicions were confirmed over a series of events that unfolded over the course of two hours, which demonstrated that there was a distinct possibility that someone who might have observed those events, or the police and canine presence at the motel, might have informed someone involved with the criminal activity, and, thus, the police had ample reason, under the facts of this case, to believe that, in the absence of swift action in opening the door to the room and performing a visual sweep, there was a significant risk of the destruction of evidence.

Argued April 24—officially released October 9, 2018

*Procedural History*

Information charging the defendant with the crimes of possession of more than four ounces of marijuana, conspiracy to possess more than four ounces of marijuana, possession of a controlled substance with intent to sell, conspiracy to possess a controlled substance with intent to sell, possession of narcotics, conspiracy to possess narcotics, possession of narcotics with intent to sell by a person who is not drug-dependent, conspiracy to possess narcotics with intent to sell by a person who is not drug-dependent, operation of a drug factory, and conspiracy to operate a drug factory, brought to the Superior Court in the judicial district of Stamford, geographical area number one, where the court, *Blawie, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the defendant was presented to the court on a conditional plea of nolo contendere to conspiracy to possess a controlled substance with intent to sell, conspiracy to possess a controlled substance with intent to sell by a person who is not drug-dependent, and conspiracy to operate a drug factory; judgment of guilty in accordance with the plea; thereafter, the state entered a nolle prosequi as to the remaining charges, and the defendant appealed to this court. *Affirmed.*

*Laila M.G. Haswell*, senior assistant public defender, with whom, on the brief, was *Lauren Weisfeld*, chief of legal services, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Susan M. Campbell*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. Following a conditional plea of nolo contendere, entered pursuant to General Statutes § 54-94a,[1] the defendant, Ricardo Correa, appeals from the judgment of conviction of conspiracy to possess a controlled substance with intent to sell in violation of General Statutes §§ 53a-48 and 21a-277 (b), conspiracy to possess a controlled substance with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 and 21a-278 (a), and conspiracy to operate a drug factory in violation of General Statutes §§ 53a-48 and 21a-277 (c). The defendant entered his conditional plea following the court's denial of his motion to suppress evidence seized from a motel room he was renting. On appeal, the defendant claims that the trial court erred in denying his motion to suppress because: (1) a warrantless dog sniff outside the door of his motel room violated his state constitutional rights, and (2) a warrantless visual search of his motel room violated his state and federal constitutional rights. We affirm the judgment of the trial court.

The trial court set forth the following findings of fact in its memorandum of decision on the defendant's motion to suppress. During the early morning hours of February 5, 2013, Sergeant Christopher Broems of the Stamford Police Department was parked on Home Court, a street immediately behind the America's Best Value Inn motel (motel) on East Main Street in Stamford. Sergeant Broems, a nineteen year veteran of the Stamford Police Department who also spent three years in the New York City Police Department, had made many prior arrests at the motel for narcotics, prostitution, and other criminal activity. From the street, Sergeant Broems was surveilling the motel for evidence of possible illegal activity. He was parked approximately fifty yards away from the motel and had a clear, well illuminated view of the motel, which included two floors of numbered motel room doors that opened onto the back parking lot.

At approximately 1:20 a.m., Sergeant Broems observed a silver colored 2004 GMC Yukon pull into the motel parking lot. Only the passenger in the Yukon, who was later determined to be Eudy Taveras, exited the Yukon, while the operator remained in the vehicle with the headlights on. Taveras approached and entered room 118 of the motel, which was on the first floor, where he remained for less than one minute. Taveras returned to the vehicle, which then left the motel. Given the location, time of night, and duration of the visit, Sergeant Broems believed that he may have witnessed a narcotics transaction out of room 118. Sergeant Broems radioed to a nearby colleague, Officer Vincent Sheperis, that he intended to stop the Yukon, and then drove in the direction of the Yukon.

When the operator of the Yukon, who was later determined to be Charles Brickman, observed Sergeant Broems approaching the Yukon in his marked Stamford Police SUV, he turned off the Yukon's headlights. A short distance from the motel, Sergeant Broems stopped the vehicle. Officer Sheperis joined Sergeant Broems, acting as backup. When Sergeant Broems and Officer Sheperis approached the vehicle, they both smelled a strong odor of marijuana emanating from inside the Yukon. Sergeant Broems and Officer Sheperis removed Taveras from the vehicle, and Taveras admitted to possessing "weed." A search of Taveras revealed two glass jars with yellow tops containing marijuana, along with three other similar, but empty, yellow topped glass jars, as well as a knotted corner of a plastic sandwich bag containing heroin. On the basis of this evidence, Sergeant Broems requested a sweep of the Yukon by a canine officer trained in the detection of narcotics.

A canine officer, Cooper, and his Stamford Police Department handler, Sergeant Seth O'Brien, arrived on the scene shortly after Sergeant Broems' request. Cooper alerted to the center console of the vehicle, but the officers found no additional drugs. Brickman was found to have no drugs on his person. Brickman was issued an infraction ticket for operating a motor vehicle without headlights, and allowed to drive off in the Yukon. The officers detained Taveras.

Taveras informed Sergeant O'Brien that he lived with his grandmother nearby on Charles Street in Stamford. At that point, Sergeant Broems, Officer Sheperis, and Sergeant O'Brien went to the grandmother's home on Charles Street, where they spoke with Taveras' brother. Taveras' grandmother signed a consent form allowing the officers to search Taveras' bedroom. In Taveras' bedroom, the officers found numerous plastic bags with the corners cut off, consistent with narcotics packaging, along with other bags containing an off white powder residue.

The officers then returned to the motel. They spoke with the manager of the motel, who advised them that several days earlier, the defendant had rented room 118 for the week, until February 8, 2013, paying $430 in cash.[2] The manager provided the officers with documentation concerning room 118, including a photocopy of the defendant's driver's license. The guest registration card for room 118 also included the name of a second individual, Victor Taveras. Although the officers were not certain who Victor Taveras was, Sergeant O'Brien testified that they believed that he most likely was Eudy Taveras.

After speaking with the manager, the officers went together to knock on the door of room 118. The officers observed a light on in the room, but no one answered

the door. Sergeant O'Brien then retrieved Cooper and conducted a narcotics sweep, which included several passes along the first floor walkway where room 118 is located. On each pass, Cooper consistently alerted to the presence of narcotics at the door to room 118.

It was then approximately 3 a.m. on February 5, 2013, a little over ninety minutes since Sergeant Broems first observed Taveras enter and exit room 118. At this point, on the basis of all that had transpired since observing Taveras enter and exit room 118, Sergeant Broems decided to apply for a warrant to search room 118. The officers decided that Sergeant Broems and Officer Sheperis would return to Stamford Police headquarters to prepare the search warrant and to process Taveras for his drug charges, and Sergeant O'Brien would remain behind on Home Court, in the same area where Sergeant Broems was parked earlier, to surveil room 118 for any possible activity. Very shortly after the officers split up, however, just as Sergeant O'Brien was getting into position to surveil room 118, he observed the defendant on foot near the motel at the corner of Home Court and East Main Street, walking away from the motel. Sergeant O'Brien, who recognized the defendant, immediately radioed for Sergeant Broems and Officer Sheperis to return to the motel to stop the defendant.

While walking on Home Court, the defendant made eye contact with Sergeant O'Brien, who was in a marked police SUV. After the defendant made eye contact with Sergeant O'Brien, the defendant changed his direction and began walking east on East Main Street. About 100 yards from the motel, Sergeant O'Brien approached the defendant, stepped out of his police vehicle, and, addressing the defendant as "Ricky," told the defendant that he needed to speak with him. Initially, the defendant was cooperative. Sergeant Broems arrived on the scene, and the defendant was searched. The officers found that the defendant was carrying a large wad of cash, amounting to over $3600, in his pocket, along with a key to a room at the motel. Sergeant O'Brien informed the defendant that Taveras was taken into custody, and that "the jig is up." The defendant responded, "nothing in the room is mine." The defendant agreed to open the door to room 118 for the officers. When the officers and the defendant reached the threshold of room 118, however, the defendant changed his mind and refused to grant them entry. The officers informed the defendant that if he did not consent to a search of the room, they were going to obtain a search warrant.

The defendant informed Sergeant Broems that there was no one in the room. To ensure that there was no one else inside the room that might destroy evidence before the officers could obtain a search warrant, however, Sergeant Broems used the defendant's room key to open the door. After opening the door, Sergeant

Broems announced "Police!" and looked inside the room for approximately fifteen to thirty seconds.[3] Once he was satisfied that the room contained no occupants, Sergeant Broems closed the door. While the door was open, neither Sergeant Broems, nor any other officer or Cooper, set foot in or otherwise physically entered room 118. When he did not observe anyone in the room, Sergeant Broems "cleared" room 118. Although he did not enter the room, or take any steps to seize any evidence located inside the room, Sergeant Broems did observe a large black digital scale on a table, as well as a plastic sandwich bag lying on the floor nearby. The officers advised the defendant that he was free to leave the motel, and the defendant left.

Following the defendant's departure, other officers of the Stamford Police Department arrived at the motel. Those officers were assigned to watch room 118 while the investigating officers prepared an application for a search warrant, with Sergeant O'Brien and Officer Sheperis acting as affiants. Several hours later, at 9:20 a.m., the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, signed the search warrant for room 118.

When the police executed the search warrant, they discovered a total of approximately 200 grams of heroin, with a street value of approximately $85,000. The heroin was broken down into dozens of smaller baggies or glassine folds for individual sale. The officers also discovered a large quantity of U.S. currency, a laptop computer, and paper documents pertaining to a street gang, the Latin Kings. The police also discovered over four ounces of marijuana and a quantity of packaging materials, along with a vacuum sealing machine, two sifters, and two digital scales. These items were consistent with the operation of a drug factory by the defendant in the motel room. After the search warrant was executed, the police arrested the defendant at Taveras' grandmother's house on Charles Street. The defendant was charged with a variety of felony drug offenses.[4] On October 28, 2015, the defendant filed a motion to suppress "all items seized by police on February 5, 2013 from America's Best Value Inn Room #118." In his memorandum of law in support of the motion to suppress, the defendant argued that because Sergeant Broems' visual sweep of the room was performed without obtaining a valid search warrant, it was "per se unreasonable." The defendant further argued that, because the search did not fall within any recognized exceptions to the warrant requirement, as no exigent circumstances existed at the time and the conduct fell short of a protective sweep, "any evidence found as a result of the prior police illegality must be suppressed."

The court held a hearing on the motion to suppress on February 29, 2016. The state presented the testimony of Sergeant Broems, Officer Sheperis, and Sergeant O'Brien. At the conclusion of the suppression hearing,

the state did not contest that Sergeant Broems' visual sweep of the room constituted a warrantless search within the meaning of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. Rather, the state argued that because Officer Broems' visual sweep of room 118 was undertaken "solely for the purpose of insuring the lack of—insuring that no evidence was being destroyed," it was lawful pursuant to the exigent circumstances exception to the warrant requirement. The state specifically noted that the visual sweep did not constitute a "protective sweep."[5] The state alternatively argued that, even if the visual sweep was unlawful, the evidence seized from the room was still admissible pursuant to the independent source doctrine.

On June 22, 2016, the court denied the defendant's motion to suppress in a written memorandum of decision. The court concluded that Sergeant Broems' warrantless visual sweep was proper, under the exigent circumstances doctrine, to prevent the destruction of evidence. The court reasoned that, "when all the facts of this case as known by police at the time of the warrantless entry by Broems are viewed objectively, the case meets the criteria for a finding of exigent circumstances." In reaching its decision, the court noted that other courts have found that evidence destruction is frequent in drug cases, and it relied on the testimony of the police officers, including: Sergeant Broems' testimony that his only motivation to open the door to room 118 was to avoid the destruction of possible evidence; Sergeant O'Brien's testimony that, based on his training and experience, it is common for additional people to be present in a motel room, especially in the context of narcotics or prostitution, regardless of the actual number of registered parties; Sergeant O'Brien's testimony that he was concerned that, on the basis of his prior experience as a trained officer with respect to the destruction or contraband or evidence, a number of people already knew of the Stamford police's investigation into the activity in room 118, and that phone calls informing potential confederates of that investigation may have already been made, prompting the destruction of evidence; and Sergeant Broems' testimony that he believed that there was a real possibility for the loss of potential evidence of illegal activity in room 118 because the police did not continue to surveil room 118 after initially departing the motel to stop the Yukon. The court further noted that the officers were not aware of the true extent of Taveras' involvement with the room, or the possibility of the presence of other persons inside the room. The court also concluded that "even assuming, arguendo, that the act of Broems in opening the door without a warrant in order to check the room for other occupants violated the defendant's fourth amendment rights, the court finds that the evidence later seized pursuant to a search warrant is admissible

under the independent source doctrine.''

On October 19, 2016, the defendant entered a conditional plea of nolo contendere to conspiracy to possess a controlled substance with intent to sell in violation of General Statutes §§ 53a-48 and 21a-277 (b), conspiracy to possess a controlled substance with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 and 21a-278 (a), and conspiracy to operate a drug factory in violation of General Statutes §§ 53a-48 and 21a-277 (c). The plea was entered conditionally on his right to take an appeal from the court's ruling on the motion to suppress. The court, *Blawie, J.*, rendered a judgment of conviction. The court sentenced the defendant to a term of incarceration of nine years on each of the charges, followed by six years of special parole, to run concurrently with one another, for a total effective sentence of nine years to serve followed by six years of special parole. On March 31, 2017, the court made a finding that the motion to suppress was dispositive of the case.[6] This appeal followed.

We begin by noting that ''[a]s a general matter, the standard of review for a motion to suppress is well-settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

''Notwithstanding the responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude.'' (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222–24, 100 A.3d 821 (2014).

## I

For the first time on appeal, the defendant claims that the dog sniff constituted a violation of his rights under article first, § 7, of the state constitution. Specifically, he argues that "the police conducted an illegal, warrantless dog sniff search of the outside door of the defendant's hotel room during which the canine signaled that he detected drugs in the room," and as a result of that illegal search, obtained a search warrant for his motel room. The defendant concedes that this issue is unpreserved, but nevertheless seeks review pursuant to the bypass doctrine set forth by our Supreme Court in *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015),[7] or reversal pursuant to the plain error doctrine. See Practice Book § 60-5 ("[t]he court may in the interests of justice notice plain error not brought to the attention of the trial court").[8] The record is adequate to review the defendant's claim,[9] and the issue of a warrantless search is an issue of constitutional magnitude. See *State* v. *Buie*, 129 Conn. App. 777, 787, 21 A.3d 550, aff'd, 312 Conn. 574, 94 A.3d 608 (2014) (concluding that defendant's claim satisfied *Golding*'s second prong where he was alleging violation of his right to be free from unreasonable searches under article first, § 7, of the Connecticut constitution). The defendant cannot, however, establish a constitutional violation. We therefore conclude that the defendant's state constitutional claim is reviewable, but fails under *Golding*'s third prong.[10]

Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any persons or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."[11] "A search for purposes of the [f]ourth [a]mendment occurs when a reasonable expectation of privacy is infringed." *State* v. *Saturno*, 322 Conn. 80, 88, 139 A.3d 629 (2016). "It is well established that, in determining whether the police conducted a search within the meaning of article first, § 7, a court employ[s] the same analytical framework that would be used under the federal constitution. . . . Specifically, we ask whether the defendant has established that he had a reasonable expectation of privacy in the area or thing searched. . . . In the absence of such an expectation, the subsequent police action has no constitutional ramifications . . . . The determination of whether such an expectation exists is to be made on a [case-by-case] basis . . . and requires a [two part] inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and, second, whether that expectation is one society recognizes as reasonable. . . . Whether

a defendant's actual expectation of privacy in a particular place is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances. . . .

"The determination that a particular place is protected under [article first, § 7] requires that it be one in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy. . . . It must be one that society is prepared to recognize as reasonable. . . . Legitimate expectations of privacy derive from concepts of real or personal property law or [from] understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others . . . and one who owns or lawfully possesses or controls properly will in all likelihood have a legitimate expectation of privacy by virtue of his right to exclude. . . . Of course, one need not have an untrammeled power to admit and exclude in order to claim the protection of [article first, § 7, as] long as the place involved is one affording an expectation of privacy that society regards as reasonable." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Kono*, 324 Conn. 80, 89–91, 152 A.3d 1 (2017).

The defendant's state constitutional claim rests on his interpretation of a recent decision by our Supreme Court, *State* v. *Kono*, supra, 324 Conn. 80, in which that court decided the issue of "whether article first, § 7, of the Connecticut constitution prohibits police from conducting a warrantless canine sniff of the front door of a condominium in a multiunit condominium complex, and the common hallway adjacent thereto, for the purpose of detecting marijuana inside the condominium." (Footnote omitted.) Id., 82. On the basis of the court's ruling that the dog sniff did constitute a search within the meaning of article first, § 7, the defendant argues: "The police did not obtain a warrant before they decided to conduct a dog sniff search of the pathway right outside of the defendant's hotel room. . . . Thus, under the recent case of *State* v. *Kono*, [supra, 80], the dog sniff of the hotel room violated the defendant's right under the state constitution to be free of illegal search and seizure."

In *Kono*, the police, after receiving an anonymous tip that the defendant was boasting about growing marijuana in his condominium, which was located in a condominium complex in Berlin, obtained consent from the property manager to enter the building. Id., 83. Specifically, the property manager signed a consent form allowing the police officers and a canine officer, Zeusz, to conduct a sweep of the common areas of the building. Id. Because the outside doors to the multiunit condominium buildings were normally locked, allowing access only through a keypad, a property manager

admitted the police and Zeusz into the building. Zeusz, who was trained to detect various controlled substances, including marijuana, was accompanied by his handler, an officer of the Berlin Police Department. Id., 83–84.

The officer first had Zeusz conduct a "presearch," of the first floor common hallway, during which he was allowed to walk throughout the condominium building hallway without direction. Id., 84. After the presearch, the officer conducted a directed search in which Zeusz was commanded to sniff at the bottom of the front door of each condominium unit on the first floor. Id. The same presearch and directed search procedures also were conducted on the second floor, where the defendant's condominium unit was located.[12] When Zeusz performed his sniff at the bottom of condominium unit 204, the defendant's unit, he sat down in front of the door, which constituted a passive alert for drugs in the unit. Id.

The police knocked on the door to unit 204, but received no response. Id. An officer remained at the door to ensure that no one entered the premises, and another officer left to prepare a search warrant application. Id. Approximately four hours later, the officer returned with a signed search warrant. Id. Upon executing the warrant, the police discovered an indoor greenhouse containing marijuana plants, as well as seeds, lighting equipment, and various firearms. Id. The defendant was arrested and charged with several drug and weapon related offenses. Id.

The defendant moved to suppress the evidence seized from his condominium on the ground that a canine sniff of the threshold of his home, conducted for the purpose of investigating the home's contents, constituted a search under both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution, and therefore, required a warrant based on probable cause. Id., 84–85. Specifically, the defendant argued that the front door to his condominium unit, as well as the hallway adjacent to his front door, were "within the constitutionally protected curtilage of his condominium unit such that the entry of a dog into that area for the purpose of conducting a drug sniff constituted a trespass." Id., 85. The defendant further argued that the canine sniff violated his reasonable expectation of privacy. Id. The trial court agreed with the defendant that the canine sniff violated his reasonable expectation of privacy under the fourth amendment,[13] and granted the defendant's motion to suppress.[14] Id., 82. The state appealed. Id.

On appeal to our Supreme Court, the state reasserted its trial court argument that the canine sniff of the defendant's front door and the hallway adjacent thereto did not constitute a search under article first, § 7, because the defendant had no reasonable expectation

of privacy in the common hallway or the contraband inside his home. Id., 89. The court, employing the multifactor approach set forth in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992),[15] looked first to federal precedent involving the use of a trained narcotics detection dog. *State* v. *Kono*, supra, 324 Conn. 92. The court concluded that "federal precedent provides support for the defendant's claim of a state constitutional violation."[16] Id., 93. The court next examined precedent from other state courts, and concluded that "it appears that the weight of sister state precedent supports the view that the canine sniff of the defendant's door in the present case was a search under our constitution."[17] Id., 121. Finally, the court concluded that there is "no principled reason of public policy . . . why, in the context of canine sniffs, the firm and bright line that we draw at the entrance of the house should apply to single-family dwellings but not to dwellings in a multiunit building. Indeed, as the Seventh Circuit observed in *Whitaker*, allowing police dogs to sniff the doors of apartments but not freestanding homes would be deeply troubling because it would apportion [constitutional] protections on grounds that correlate with income, race, and ethnicity." (Internal quotation marks omitted.) Id., 121. The court held that a canine sniff directed toward a home—whether freestanding or part of a multitenant structure—is a search for purposes of article first, § 7, of the Connecticut constitution and, therefore, requires a warrant issuing upon a court's finding of probable cause. Id., 122. The court, therefore, concluded that the defendant was entitled to suppression of the evidence seized from his residence as a fruit of the warrantless canine sniff, and affirmed the judgment of the trial court. Id., 122.

We disagree with the defendant's assertion that "[t]his case is indistinguishable from and is controlled by *Kono*." This case concerns the shared open walkway of a motel.[18] In *Kono*, the hallway was closed off, and located on the *inside of* the condominium complex structure, which was restricted by a locked door. It was accessible only by keycard access, and the police needed to obtain permission before entering the hallway. The open, shared walkway here, was located on the outside of the structure. It was open to the public, as well as completely illuminated and visible to anyone as far as fifty yards away, even at nighttime. Furthermore, no permission was required to traverse the walkway, evidenced by the ease with which the officers, and eventually Cooper, did so. We conclude that because of the nature of the walkway on which room 118 was located, *Kono* is distinguishable from the present case.

As the court in *Kono* noted, the determination of whether a defendant possesses a reasonable expectation of privacy in an area or thing to be searched is made on a case-by-case basis. See id., 90. We conclude that, under the facts of this case, the defendant has

not shown a reasonable expectation of privacy on the outside of the door to his motel room. Furthermore, the defendant cites no authority to support his assertion that a canine sniff outside the door of a motel room, conducted from an open walkway, which is visible to and accessible by any member of the public, constitutes a search within the meaning of article first, § 7, of our state constitution.[19] In the absence of such authority, we decline to extend *Kono*'s reach to the facts of this case.

Because the defendant's constitutional claim hinges on his interpretation of *Kono*,[20] in light of our conclusion that it is inapplicable to the facts of his case, we conclude that he has failed to demonstrate a constitutional violation.[21] Accordingly, the defendant's unpreserved state constitutional claim fails under *Golding*'s third prong. The defendant also is unable to prevail under the plain error doctrine, as he cannot demonstrate that an obvious error exists that affects the fairness and integrity of and public confidence in the judicial proceedings.

## II

The defendant next claims that Sergeant Broems' conduct in opening the door to room 118 and conducting a visual sweep of the room was unlawful under the federal and state constitutions.[22] The state does not dispute that Sergeant Broems' conduct constituted a warrantless search within the meaning of the fourth amendment to the federal constitution and article first, § 7, of the state constitution. Rather, the state argues only that the search was justified by exigent circumstances—namely, the potential destruction of evidence. The defendant argues that "none of the officers who testified could identify any definite and specific reason for believing that someone was in the room who might destroy the evidence," and, therefore, the officers did not hold a reasonable belief that immediate action was necessary. We are not persuaded.

"Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception. . . . Our law recognizes that there will be occasions when, given probable cause to search, resort to the judicial process will not be required of law enforcement officers. [For example], where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . a warrant will not be required. . . .

"The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those

situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." (Citations omitted; internal quotation marks omitted.) *State* v. *Owen*, 126 Conn. App. 358, 364–65, 10 A.3d 1100, cert. denied, 300 Conn. 921, 14 A.3d 1008 (2011). The test for determining whether exigent circumstances justify a warrantless search or seizure is "whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest [or entry] were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. . . .

"[N]o single factor, such as a strong or reasonable belief that the suspect is present on the premises, will be determinative in evaluating the reasonableness of a police officer's belief that a warrantless entry or arrest was necessary. Rather than evaluating the significance of any single factor in isolation, courts must consider all of the relevant circumstances in evaluating the reasonableness of the officer's belief that immediate action was necessary." (Internal quotation marks omitted.) *State* v. *Kendrick*, supra, 314 Conn. 227, 229.

"It is well established in Connecticut . . . that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. . . . This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the arresting officer actually did believe. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry." (Citations omitted; internal quotation marks omitted.) *State* v. *Owen*, supra, 126 Conn. App. 365. "[T]he trial court's legal conclusion regarding the applicability of the exigent circumstances doctrine is subject to plenary review." *State* v. *Kendrick*, supra, 314 Conn. 222.

As a preliminary matter, we must first determine whether, at the time of Sergeant Broems' visual sweep, probable cause existed to search room 118. See *State* v. *Owen*, supra, 126 Conn. App. 366. We conclude that it did. "Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal. . . . Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Probable

cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . Reasonable minds may disagree as to whether a particular affidavit establishes probable cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 864–65, 776 A.2d 1091 (2001).

"We consistently have held that [t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence. . . . Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . The probable cause determination is, simply, an analysis of probabilities. . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act. . . . Probable cause is not readily, or even usefully, reduced to a neat set of legal rules. . . . Reasonable minds may disagree as to whether a particular [set of facts] establishes probable cause. . . .

"The determination of whether probable cause exists under the fourth amendment to the federal constitution . . . is made pursuant to a totality of circumstances test. . . . The probable cause test then is an objective one." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, 286 Conn. 427, 435–36, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008). "In a warrantless arrest or search, as well as one made pursuant to a warrant, the reviewing court must pay great deference to the magistrate's determination of probable cause. . . . This court must not attempt a de novo review where there has already been a determination at a suppression hearing that probable cause exists. . . . When a trial court rules on a motion to suppress without making detailed findings of fact to support its ruling, an appellate court may look to the evidence produced in support of the ruling. . . . Where, as in this case, however, the trial court performs its judicial function conscientiously by detailing the facts which the state has established, we are not free to add facts which are not found and which are not undisputed." (Citations omitted; internal quotation marks omitted.) *State* v. *Velez*, 20 Conn. App. 168, 174, 565 A.2d 542 (1989), rev'd on other grounds, 215 Conn. 667, 577 A.2d 1043 (1990).

The defendant contends that "[e]ven construing the

facts as broadly as possible, there is simply no probable cause to search the hotel room because the facts fail to establish a nexus between drug activity and the hotel room." We disagree and conclude that there was ample evidence that would persuade a reasonable person to believe that criminal activity had occurred. The evidence would also lead a reasonable person to conclude that there was a fair probability that contraband or evidence of that crime would be found in room 118. First, Sergeant Broems observed Taveras' quick visit to room 118, which led him to believe, on the basis of the location of the motel, the time of night, and the duration of the visit, that he had witnessed a drug transaction out of room 118. Sergeant Broems and Sergeant O'Brien then stopped the Yukon in which Taveras was traveling, and discovered narcotics on Taveras' person. That interaction led the police to the house of Taveras' grandmother, where they discovered items consistent with narcotics packaging. The police then learned that room 118 was registered to the defendant and another person by the name of Victor Taveras. When Sergeant O'Brien observed the defendant, the defendant made eye contact with him, changed direction and began walking east on East Main Street rather than continuing on Home Court, where Sergeant O'Brien was parked. After Sergeant O'Brien approached the defendant, the police discovered a large amount of cash and a key to room 118 on his person. When the police informed the defendant at that point that they had arrested Taveras and that "the jig is up," the defendant responded, "nothing in the room is mine," implying that something, with which the defendant did not want to be associated, was present in the room. On the basis of these facts known to the police, a reasonable person would believe that criminal activity had occurred, and that room 118 contained evidence of such criminal activity.

Having determined that there existed probable cause to search room 118 at the time of Sergeant Broems' visual sweep, we now turn to the question of whether, under the totality of the circumstances, a reasonable, well trained police officer reasonably would have believed that immediate entry into room 118 was necessary to prevent the destruction of evidence. We answer that question in the affirmative. We agree with the trial court's conclusion that "when all the facts of this case as known by the police at the time of the warrantless entry by Broems are viewed objectively, the case meets the criteria for a finding of exigent circumstances."

On the basis of firsthand observations, the police had reason to suspect that drug related criminal activity was occurring in room 118. These suspicions were confirmed by a series of events, unfolding over the course of approximately two hours in the early hours of the morning of February 5, 2013. That course of events included police interactions with at least four people who were not taken into police custody before Sergeant

Broems opened the door to room 118, including Brickman, Taveras' brother, Taveras' grandmother, and the hotel manager. Additionally, it was reasonable for the police to fear that even unknown passersby might become aware of the police investigation into room 118. Sergeant O'Brien, an experienced police officer, testified about his concerns that phone calls may have occurred between people aware of the investigation into the activity in room 118 and possible confederates, prompting the destruction of evidence inside of the room.

We find this court's decision in *State* v. *Reagan*, 18 Conn. App. 32, 556 A.2d 183, cert. denied, 211 Conn. 805, 559 A.2d 1139 (1989), persuasive on this point. In *Reagan*, the state police were surveilling the defendant's home for possible drug activity. Id., 34. While surveilling the home, the police observed what appeared to be a drug transaction occurring between the defendant and a man, as well as a woman arriving to the home in a car, entering the house and leaving after less than one minute. Id. Following the man's departure from the home, the police stopped and searched his vehicle at a nearby gas station. Id. The police discovered narcotics in the man's vehicle and arrested him. Id. During the search and arrest, several people watched from a distance, including the woman who the officers earlier observed entering and leaving the defendant's home. Id. After arresting the man, the police applied for a search warrant, but because they thought it would take at least three hours, they "decided that a significant risk existed that the defendant would learn of [the man's] arrest and destroy any incriminating evidence," and entered the defendant's home before a warrant was issued. Id., 35.

The defendant moved to suppress all evidence obtained during the search as fruit of an illegal search and arrest. Id., 36. The trial court denied the motion to suppress, finding that the warrantless entry was justified by exigent circumstances, and this court affirmed. Id. This court concluded that the trial court properly found that the warrantless entry into the defendant's home and his subsequent arrest were justified by the existence of exigent circumstances, as "the possibility that a suspect knows or may learn that he is under surveillance or at risk of immediate apprehension may constitute exigent circumstances, on the theory that the suspect is more likely to destroy evidence, to attempt to escape or to engage in armed resistance." Id., 38. The court reasoned: "[I]n the present case, police detained and arrested an individual seen leaving the defendant's home. The arrest site was located on the corner of the defendant's street, approximately one quarter of a mile from the defendant's home. Several people observed this arrest, one of whom was seen by police conversing with [the man]. In addition, there was testimony indicating that the arrest was observed by a

woman seen by police at the defendant's home. Given the small size of the town, the proximity of the arrest to the defendant's home and the observation of that arrest by several people, we conclude that police had reasonable grounds to believe that if an immediate entry into the defendant's home were not made, the defendant would be alerted to the arrest of [the man] and destroy any incriminating evidence." Id., 39.

Similar to the facts of *Reagan*, there was a distinct possibility that someone who observed either the police stop of the Yukon, Taveras' arrest, or the police and canine presence at the motel, might inform someone involved with the criminal activity. The stop of the Yukon and the arrest of Taveras, a person seen leaving room 118 and seemingly known to the defendant, occurred a short distance from the motel. Brickman, Taveras' grandmother, and Taveras' brother were aware that the police arrested Taveras after he left the motel. The police located and arrested the defendant hours later at the home of Tavares' grandmother. Given the proximity of the arrest of Taveras to the motel and the knowledge of that arrest and the ensuing investigation by at least four people, the police had reasonable grounds to believe that if an immediate entry were not made into room 118, incriminating evidence may be destroyed.

Furthermore, Sergeant Broems, on the basis of his own training and experience, noted that from the time Taveras entered the room until the the police returned to the room with the defendant after 3 a.m., there was "nobody with eyes on" the room, which might have allowed an unknown person to enter room 118 and destroy evidence contained therein. Although no one answered when the police knocked on the door earlier in the night, and there was no evidence confirming the presence of an additional person in room 118, these facts, coupled with the observation of a light on in the room, provided ample reason to believe that, absent swift action in opening the door to room 118 and performing a visual sweep, there was a significant risk of the destruction of evidence. It was reasonable for the police to believe that the delay necessary to obtain a search warrant may have resulted in the destruction of incriminatory evidence.

The court properly concluded that the search was lawful under the exigent circumstances exception to the warrant requirement.[23] Accordingly, the court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion

to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[2] As the result of a prior case, the Stamford police already knew the defendant by name.

[3] Sergeant O'Brien characterized the sequence of events as follows: "[Broems] cracked the door, stuck his head in, cleared it, you know, visually and then he relayed that nobody else was in there, he closed the door."

[4] The defendant was charged with the crimes of possession of more than four ounces of marijuana in violation of General Statutes (Rev. to 2013) § 21a-279 (b); conspiracy to possess more than four ounces of marijuana in violation of General Statutes § 53a-48 and General Statutes (Rev. to 2013) § 21a-279 (b); possession of a controlled substance with intent to sell in violation of General Statutes § 21a-277 (b); conspiracy to possess a controlled substance with intent to sell in violation of General Statutes §§ 53a-48 and 21a-277 (b); possession of narcotics in violation of General Statutes § 21a-279 (a); conspiracy to possess narcotics in violation of General Statutes §§ 53a-48 and 21a-279 (a); possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (a); conspiracy to possess narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 and 21a-278 (a); operation of a drug factory in violation of 21a-277 (c); and conspiracy to operate a drug factory in violation of General Statutes §§ 53a-48 and 21a-277 (c).

[5] "The protective sweep doctrine . . . is rooted in the investigative and crime control function of the police. . . . As its name suggests, the purpose of the doctrine is to allow police officers to take steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could not unexpectedly launch an attack. . . . Although originally a protective sweep was defined as one made incident to a lawful arrest . . . the scope has since been broadened so that the current rule is that a law enforcement officer present in a home *under lawful process* . . . may conduct a protective sweep when the officer possesses articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 229–30, 100 A.3d 821 (2014).

[6] The defendant filed his appeal on December 13, 2016. On his appeal form, he listed "denial of the defendant's motion to suppress evidence" as the appealable judgment or decision. On December 29, 2016, the defendant filed a motion, without objection from the state, requesting permission to correct his appeal form to state that he was appealing "from judgment and sentencing following a nolo contendere plea following denial of a motion to suppress." On February 17, 2017, this court granted that motion, and also sua sponte ordered that "the matter is remanded to the trial court, *Blawie*, *J.*, for a determination regarding whether the ruling on the motion to suppress would be dispositive of the case as required by General Statutes § 54-94a. See *State* v. *McGinnis*, 83 Conn. App. 700 [851 A.2d 349] (2004); *State* v. *Douros*, 87 Conn. App. 122 [864 A.2d 57] (2005)."

[7] Pursuant to *Golding*, a defendant may prevail on a claim of constitutional error not preserved at trial only if all four of the following conditions are satisfied: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding* by eliminating word "clearly" before words "exists" and "deprived").

[8] "[T]he plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and

public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, a] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Terry*, 161 Conn. App. 797, 820, 128 A.3d 958 (2015), cert. denied, 320 Conn. 916, 131 A.3d 751 (2016).

[9] The state argues that the record is inadequate for review. Specifically, the state argues that "[b]ecause the defendant did not challenge the dog sniff below, both the state and the trial court were temporally focused on Broems' opening of the door," and, therefore, "the state will be unable to show that despite the alleged illegality of the canine sniff, the evidence was nevertheless admissible under the independent source doctrine." Because we do not reach the issue of whether the independent source doctrine applies in this case; see footnote 20 of this opinion; we need not decide the adequacy of the record with respect to that issue.

[10] The defendant also argues that, because our Supreme Court decided *State* v. *Kono*, 324 Conn. 80, 152 A.3d 1 (2016), in which it held that a dog sniff of the outside door of a condominium, conducted from a common hallway in the condominium building, constitutes a search within the meaning of article first, § 7, of the Connecticut constitution, after the trial court decided the motion to suppress, "this case falls squarely under the rule permitting review when 'a new constitutional right not readily foreseeable has arisen between the time of trial and appeal.' [*State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973)]." This argument necessarily fails on the basis of our conclusion that *Kono* does not apply to the facts of this case.

[11] The language of the fourth amendment to the federal constitution similarly states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

[12] The other officers, who were aware of which condominium unit belonged to the defendant, did not inform Zeusz' handler which condominium unit was under investigation. *State* v. *Kono*, supra, 324 Conn. 84.

[13] The trial court in *Kono* primarily relied on Second Circuit precedent which held that "a canine sniff of a person's front door in a multiunit apartment building, for the purpose of detecting drugs inside the apartment, constituted a search within the meaning of the fourth amendment," and two United States Supreme Court decisions, which held that "a canine sniff conducted within the curtilage of a single-family residence ([*Florida* v. *Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013)]) and the thermal imaging of a single-family residence ([*Kyllo* v. *United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001)]), for purposes of detecting marijuana therein, violated the fourth amendment to the United States constitution." *State* v. *Kono*, supra, 324 Conn. 86.

[14] On appeal, the defendant also argued, consistent with the trial court's conclusion, that the canine sniff violated the fourth amendment's prohibition against unreasonable searches and seizures. Our Supreme Court, however, decided only the state constitutional issue, explaining: "We recently have explained that when the issue presented is one of first impression under both the state and federal constitutions, it is appropriate to consider the state constitutional claim first, turning to the federal claim only after determining that the appellant's state constitutional [challenge] will not succeed. . . . As we discuss more fully in part IV of this opinion, we see no reason to deviate from this approach when, as in the present case, the issue is not truly settled under the federal constitution, such that we cannot predict to a reasonable degree of certainty how the United States Supreme court would resolve the issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Kono*, supra, 324 Conn. 82 n.3.

[15] "In order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the *textual approach* . . . (2) *holdings and dicta of this court, and the Appellate Court* . . . (3) *federal precedent* . . . (4) *sister state decisions* or sibling approach . . . (5) the *historical approach*, including the historical constitutional setting and the debates of the framers . . . and (6) *economic/sociological considerations*." (Citations omitted; emphases in original; internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Our Supreme

Court has noted, however, "that these factors may be inextricably inter-woven, and not every [such] factor is relevant in all cases." *State* v. *Kono*, supra, 324 Conn. 92.

[16] Specifically, the court cited the Second Circuit's decision in *United States* v. *Thomas*, 757 F.2d 1359, 1367 (2d Cir. 1985), cert. denied, 474 U.S. 819, 106 S. Ct. 67, 88 L. Ed. 2d 54 (1985), in which the court held that a canine sniff of the common hallway of a multiunit apartment building, for the purpose of detecting drugs inside one of the apartments, constitutes a search within the meaning of the fourth amendment, and *United States* v. *Whitaker*, 820 F.3d 849 (7th Cir. 2016), in which the United States Court of Appeals for the Seventh Circuit reaffirmed that principle. *State* v. *Kono*, supra, 324 Conn. 93. Although it noted that the United States Supreme Court had not yet decided the issue decided by *Thomas*, the court noted two cases which "tend to favor the defendant's position": the United States Supreme Court's decisions in *Kyllo* and *Jardines*. See id.; see also footnote 15 of this opinion. The court finally cited *United States* v. *Hopkins*, 824 F.3d 726, 729, 731–33 (8th Cir. 2016), cert. denied, U.S. , 137 S. Ct. 522, 196 L. Ed. 2d 425 (2016), in which the United States Court of Appeals for the Eighth Circuit held that a canine sniff of the front door of a two-story townhouse, which shared a common walkway and front stoop with the unit next door, violated the fourth amendment.

[17] The court noted that only seven states appear to have addressed the issue of whether a canine sniff of an apartment door in a multiunit building is a search within the meaning of the federal, or their respective state, constitutions. *State* v. *Kono*, supra, 324 Conn. 116. The court further noted that five states, Illinois, Minnesota, Nebraska, New York, and Texas, had concluded that it is a search that requires either a reasonable and articulable suspicion or a warrant supported by probable cause, and two, Florida and Washington, had concluded that a canine sniff of the front door of a single family house violates the resident's reasonable expectation of privacy in the home and requires a warrant supported by probable cause. Id., 117. Additionally, the court observed that "several state appellate courts have determined that even a canine sniff of a nonresidential property may be a search under their respective state constitutions and may require a reason-able, articulable suspicion." Id., 118. Finally, the court noted that only two state appellate courts, in Maryland and North Dakota, had concluded that a canine sniff of an apartment door in a multiunit building is not a search for fourth amendment purposes. Id., 118.

[18] The defendant also argues that "[a] person who inhabits a hotel room has a reasonable expectation of privacy that is equal to the reasonable expectation of privacy possessed by occupants of any residence." The defen-dant cites our Supreme Court's decision in *State* v. *Benton*, 206 Conn. 90, 536 A.2d 572 (1987), cert. denied, 486 U.S. 1056, 108 S. Ct. 2823, 100 L. Ed. 2d 924 (1988), for this proposition.

It is useful to elaborate on the guidance provided by *Benton*. In *Benton*, our Supreme Court concluded that "[p]ersons . . . residing in an apartment, or persons staying in a hotel or motel have the same fourth amendment rights to protection from *unreasonable* searches and seizures and the same *reasonable* expectation of privacy as do the residents of any dwelling." (Emphases in original.) Id., 95. The court went on to acknowledge, however, that "[t]he shared atmosphere and the nearness of one's neighbors in a hotel or motel or apartment in a multiple family dwelling, however, diminish the degree of privacy that one can reasonably expect or that society is prepared to recognize as reasonable." Id., 96. We conclude that, as part of our case-by-case determination of whether a reasonable expectation of privacy exists in an area to be searched; see *State* v. *Kono*, supra, 324 Conn. 89; that this case is one in which the nature of the location to be searched, the outside of a door located on an open, shared walkway, diminished the degree of privacy that the defendant reasonably could expect or that society is pre-pared to recognize as reasonable.

[19] We note that, upon review of each federal case where the court was presented with a similar issue, the court has held that a dog sniff of a hotel or motel room door, performed from a shared corridor or walkway, does not constitute a search within the meaning of the fourth amendment. See *United States* v. *Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997) ("[The defendant] had an expectation of privacy in his Hampton Inn hotel room. But because the corridor outside that room is traversed by many people, his reasonable privacy expectation does not extend so far. Neither those who stroll the corridor nor a sniff dog needs a warrant for such a trip. As a result, we hold that a trained dog's detection of odor in a common corridor does not contravene the Fourth Amendment."); *United States* v. *Lewis*, United States

District Court, Docket No. 1:15-CR-10 (TLS) (N.D. Ind. July 10, 2017) (concluding that dog sniff of defendant's hotel room door, which was located along open air walkway, was not search within meaning of fourth amendment, because of nature of walkway, "an unenclosed, common area that was readily accessible to the public at all hours"); *United States* v. *Marlar*, 828 F. Supp. 415, 419 (N.D. Miss. 1993) (concluding that defendant possessed a reasonable expectation of privacy in his motel room, but that dog sniff outside defendant's door, which "opened to the exterior of the building," did not infringe on that expectation of privacy), dismissed on other grounds, 68 F.3d 464 (1995).

[20] Because we determine that the search was lawful, we need not decide the applicability of the independent source doctrine, a doctrine which applies in the context of the exclusionary rule. See *State* v. *Brocuglio*, 264 Conn. 778, 786–87, 826 A.2d 145 (2003) ("As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the fourth amendment to the United States constitution. . . . The rule applies to evidence that is derived from unlawful government conduct, which is commonly referred to as the fruit of the poisonous tree. . . . In *State* v. *Dukes*, 209 Conn. 98, 115, 547 A.2d 10 (1988), we concluded that article first, § 7, of the Connecticut constitution similarly requires the exclusion of unlawfully seized evidence." [Citations omitted; internal quotation marks omitted.]); *State* v. *Vivo*, 241 Conn. 665, 672, 697 A.2d 1130 (1997) ("[t]he independent source doctrine . . . [is a] recognized [exception] to the exclusionary rule").

[21] The state additionally argues that if this court determines that a dog sniff of the outside of a door to a motel room constitutes a search under our state constitution, we also should hold that such a search is constitutionally valid if supported by a reasonable and articulable suspicion, as opposed to probable cause. In light of our conclusion that the defendant has failed to show that a search occurred under the facts of this case, we decline to decide this issue.

[22] The defendant does not argue that article first, § 7, of the Connecticut constitution provides greater protection with respect to this claim.

[23] Because we conclude that the search was lawful, we need not address the trial court's conclusion regarding the applicability of the independent source doctrine. See *State* v. *Sulewski*, 98 Conn. App. 762, 764 n.2, 912 A.2d 485 (2006) (concluding that this court need not address trial court's alternative ruling that evidence was admissible pursuant to independent source doctrine in light of conclusion that stop was lawful under *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]).